**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

THE TRAVELERS INDEMNITY     :
COMPANY OF CONNECTICUT,     :
                            :
        Plaintiff,     :
                            :     CIVIL ACTION NO.
      v.                :     1:07-CV-0410-JOF
                            :
DOUGLASVILLE DEVELOPMENT,    :
LLC,                        :
                            :
        Defendant.     :

**OPINION AND ORDER**

This matter is before the court on Defendant Douglasville Development, LLC's

Motion for Partial Summary Judgment [50] and Motion to Seal [54] and Plaintiff The

Travels Indemnity Company of Connecticut's ("Travelers") Motion for Summary Judgment

[51].

**I.     Background**

Plaintiff instituted a declaratory judgment action against Defendant to determine the

extent of its liability to Defendant under a business liability insurance policy. Plaintiff and

Defendant filed opposing motions for summary judgment, each seeking favorable

declarations as to their rights and duties under the policy based on the following undisputed

facts. Defendant Douglasville Development is a Georgia LLC which was developing a site

in Douglasville, Georgia, known as Tributary New Manchester ("Tributary"), including a piece of property known as Parcel R, in 2005. While developing Parcel R, Defendant engaged in land-clearing and earthwork. Defendant built retention ponds and used various other measures known within its industry as Best Management Practices to guard against the problems that often accompany land-clearing and earthwork, including a decrease in land water absorption and an increase in surface water or sediment run-off. During the development, Defendant maintained insurance with Plaintiff Travelers under Policy Number Y-630-365X8177[1] ("the Policy").

Defendant experienced numerous difficulties with its water and sediment management on Parcel R. The Douglas County Water and Sewer Authority ("WSA") visited and inspected the Tributary on numerous occasions to ensure that Defendant was taking appropriate precautions with respect to the land-clearing and earthwork and the possible excess water. WSA visited and approved the Tributary on March 3, 2005, but noted issues with the site's retention ponds, silt fence, and other water control measures. (P. Mot., at Ex. 11). The WSA visited the site again on March 21, 2005, and issued a warning ordering Defendant to abate eight violations;[2] the warning stated that the site was not in

---

[1]Defendant took out three relevant policies under this number, TCT-03, TCT-04, and TCT-05, covering the time period from December 31, 2003, until December 31, 2006.

[2]Specifically, the warning directed Defendant to (1) install ponds 1 and 2, (2) stabilize ponds 3 and 4, (3) repair inlet to pond 4, (4) replace gravel at the retro fit on ponds 3 and 4, (5) install rip rap at the headwall to pond 3, (6) stabilize all the slopes in phase 1, (7)

compliance, and a failure to fix the problems would result in legal action. (*Id.*, at Ex. 12). The WSA inspected the site again on March 30, 2005, and found that sediment from retention pond three was being pumped directly into a nearby creek and that all the problems from the warning had not been fixed; the WSA planned to issue a stop work order. (*Id.*, at Ex. 13). The WSA issued a stop work order and directed Defendants that they would not be able to begin working again until they complied with the March 21, 2005 warning, installed all measures as required by the approved plan, and made emergency repairs as required to protect the stream and adjacent property. (*Id.*, at Ex. 15). On April 8, 2005, the WSA approved the site and instructed Defendants to clean sediment from the stream and re-stabilize the ponds. (*Id.*, at Ex. 17).

In the spring of 2005, neighboring landowners with property located directly adjacent to the Tributary site, began complaining to the WSA that the sediment from the Tributary development was being deposited on their property. One neighbor, Beverly Starling, spoke directly to a construction worker about the large amount of excess water coming onto her property. On November 15, 2005, Leonard Purvis, his wife Patricia Purvis, Beverly Starling and Kenneth Bryant ("the Claimants") sent Defendant a Notice of Intent to Sue ("the Notice"). (D. Mot., at Ex. 5). The Notice gave Defendant notice of claims under the Federal Clean Water Act, the National Pollution Discharge Elimination system, and

---

stabilize all exposed areas in phases 2 and 3, and (8) install a silt fence along the slope above area 1.

Georgia law. Further, the Notice provided that any future suit would seek injunctive relief, civil penalties and costs of litigation and that Defendant would be liable for damages recoverable under state law claims for nuisance, trespass, negligence, negligence per se, riparian rights, bad faith attorneys' fees, and punitive damages. Defendant contends that it believed it could handle the Notice on its own, and Defendant did not notify Plaintiff about it or send Plaintiff a copy.

On February 23, 2006, the Claimants filed *Leonard Purvis, et al. v. Douglasville Development, LLC*, Case No. 1:06-CV-0415, in the District Court for the Northern District of Georgia ("the underlying suit") (P. Mot., at Ex. 8). The Claimants alleged that an increased volume of water at an increased velocity carrying silt and sediment was flowing across their property and into waterways leading to the Chattahoochee River. The Claimants claimed that this increased water was the result of Defendant's negligent design and implementation of a storm water drainage system and erosion and sediment control plan on Parcel R, Defendant's failure to employ Best Management Practices while developing, and Defendant's failure to comply with state, federal, and local laws. Defendant was served with the *Purvis* complaint on March 8, 2006. At the time they filed the underlying suit, the Claimants' land was flooded, a willow tree and foot bridge on the land had been washed away, and the creek bed on the land had been eroded. The Claimants also maintained that

4

the silt, sediment, and storm water from Parcel R had caused irreparable harm to the waters on their property and the waters of the United States into which their waters run.

On March 13, 2006, Defendant sent a notice letter to its insurance agent at Travelers and enclosed a copy of the complaint in the underlying suit. (D. Mot., at Ex. 9). This letter stated, "Plaintiff's allegations are that the development activities have purportedly resulted in an increase in the volume and velocity of water flowing into the creek running across the Plaintiff's property" and requested that Plaintiff "provide a defense to and indemnify [Defendant] pursuant to the applicable policy [Y630365X8177]." (*Id.*). The agent immediately faxed the letter, complaint, and accord loss notice to Plaintiff. (*Id.*, at Ex. 10). Plaintiff acknowledged receipt of these materials by letter on May 30, 2006; Plaintiff reserved all rights and stated that Plaintiff would investigate its obligations to Defendant and would provide them with a determination as soon as possible. (*Id.*, at Ex. 11). Plaintiff contacted Defendant by letter on September 19, 2006. (*Id.*, at Ex. 12). Plaintiff identified the relevant policies, reserved all rights, and again said that Travelers would investigate and get Defendant a determination as soon as possible. Plaintiff contacted Defendant a third time on November 17, 2006. (*Id.*, at Ex. 13). Plaintiff agreed that it would participate in Defendant's response to the underlying suit, but Plaintiff reserved its rights and stated it would not cover the cost of injunctive relief, punitive damages, mental anguish, emotional trauma, or defending non-covered allegations. Plaintiff reserved the right to decline

5

coverage for any alleged damage or injury not constituting property damage as defined in the policy, any property damage taking place or suffered prior or subsequent to the dates of the policy, and for any alleged damage or injury not caused by an "occurrence" as defined in the Policy. Plaintiff informed Defendant that (1) coverage would not apply if Defendant failed to provide notice or cooperate in accordance with the policy, (2) coverage would not include any payment made, obligation assumed, or expense incurred voluntarily by Defendant, and (3) all payments made by Plaintiff would be subject to the applicable limits of liability in the policy. Defendant responded on December 4, 2006, and emphasized Plaintiff's obligations to pay all its defense costs. (*Id.*, at Ex. 14). Plaintiff brought the instant action on February 16, 2007. The parties settled the underlying suit sometime in or around December 2007.

## II.    Discussion

A party moving for summary judgment must demonstrate that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The instant matter arises out of a contract action. Under Georgia's choice of law rules governing contracts, this court must apply the substantive law of the place where the contract was delivered, in this case the law of Florida. *Shorewood Packaging Corp. v. Commercial Union Ins. Co.*, 865 F. Supp. 1577, 1578 (N.D. Ga. 1994). Georgia, however, limits the application of non-forum substantive law to statutes

6

and case law interpreting those statutes; where there is no statute involved, this court must apply the common law as developed in Georgia rather than the foreign law of Florida. *Id.* at 1581. The court will address two grounds by which Plaintiff need not provide Defendant insurance coverage for the Claimants' damages in the underlying suit.

## B.    Notice

The parties dispute whether Defendant provided proper notice to Plaintiff of the underlying suit under the Policy and whether Defendant's lack of notice, if any, precludes coverage. Section IV (2) of the Policy states:

> a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. . . . .
> . . . .
> b.    If a claim is made or "suit" is brought against any insured, you must:
> . . . .
> (2)    Notify us as soon as practicable.
> You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
> c.    You and any other involved insured must:
> (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(P. Mot., at Ex. 2, pg. 9). Section IV (3) states:

> No person or organization has a right under this Coverage Part:
> a.    To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
> b.    To sue us on this Coverage Part unless all of its terms have been fully complied with.

7

The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*, at Ex. 2, pg. 12 ).

Defendant began receiving complaints from the Claimants regarding water and sediment discharge problems in March 2005; Defendant received the Notice from Claimants in November 2005; and the Claimants filed suit on February 16, 2006. Defendant notified Plaintiff of the suit on March 13, 2006, a little less than one month after receiving the *Purvis* complaint, four months after receiving the Notice, and roughly a year after it became aware of the Claimants' complaints. Plaintiff asserts that Defendant is barred from seeking coverage under the Policy because it did not notify Plaintiff as soon as practicable following notice of the Claimants' complaints and receipt of the Notice, and it did not immediately send Plaintiff said Notice or the complaint. Defendant claims that neither the Claimants' complaints nor the Notice were "occurrences" under the Policy; Plaintiff is barred from asserting a notice defense by Fla. Stat. § 627.426; and even if Defendant's notice was untimely, Plaintiff can show no prejudice.

Georgia courts have examined numerous insurance contracts containing the exact notification language present in the Policy and stated above. The courts have found that the purpose of such language:

> is to enable the insurer to begin immediately an investigation of the facts and circumstances for determining whether liability might be present and whether a settlement of the claim should be attempted; to get the facts and circumstances for determining whether liability might be present and whether

8

> a settlement of the claim should be attempted; to get the facts while they [are] fresh and available in the minds of the parties and the witnesses as might be available; to obtain pictures, diagrams, etc. which might assist in showing how the occurrence happened and the extent of any physical damage done.

*Bituminous Casualty Corp. v. J.B. Forrest & Sons, Inc.*, 132 Ga. App. 714, 717 (1974). The question of whether notice is timely enough to effectuate this purpose or meets the definition of "as soon as practicable" or "immediately" is generally a question of fact; however, when the undisputed facts would preclude recovery, the issue of notice becomes a question of law appropriate for disposition on summary judgment. *Cotton States Mutual Insurance Co. v. International Surplus Lines Insurance Co.*, 652 F. Supp. 851, 856 (N.D. Ga. 1986) (addressing "immediately"); *Allstate Ins. Co. v. Edwards*, 237 F. Supp. 195 (N.D. Ga. 1964) (addressing "as soon as practicable"). Where notice is a condition precedent to coverage as it is here, Georgia courts have held delays of four months to one year to preclude recovery as a matter of law. *See Cotton*, 652 F. Supp. at 856 ("The Georgia courts have repeatedly held that where no valid excuse exists, failure to give written notice for periods in the range of four to eight months is unreasonable as a matter of law."); *EVI Equipment, Inc. v. Northern Ins. Co.*, 188 Ga. App. 818 (1988) (eleven-month delay); *Bituminous*, 132 Ga. App. 714 (four-month delay).

Plaintiff has an arguable position that Defendant was aware of "an offense which may result in a claim" as early as March 2005 when it, either directly or through the WSA, received complaints from Claimants. Regardless, this court finds that at the latest,

9

Defendant was aware of "an offense which may result in a claim" in November 2005 when it received the Notice. The Notice, in letter form, was several pages long, laid out the legal basis of each of the Claimants' claims, and demanded various forms of relief. This extensive information would certainly have put a reasonable party on notice that it had taken actions which might result in a legal claim and that its insurance company might wish to investigate. It is likewise clear to the court that the Notice was a "demand[], notice[], summons[] or legal paper[] received in connection with [a] claim or 'suit.'" As such, Defendant was obligated to send it to Plaintiff "immediately." It is undisputed that Defendant waited more than four months to make Plaintiff aware of the Notice or to send Plaintiff a copy. This court finds that absent an appropriate excuse from Defendant, this delay was unreasonable as a matter of law and that Defendant did not take appropriate action "immediately" or "as soon as practicable."

Defendant offers three excuses for its delay. First, Defendant contends that it had no notice of a "claim" until it received the complaint in the underlying suit because its prior communications with the Claimants had been about requests for non-monetary relief from soil and sediment damages which were not covered by the policy. Defendant contends that the first time it became aware that the Claimants were demanding monetary relief for covered damages relating to the volume and velocity of water discharge from the site was when it received the complaint. The court finds this argument to be factually incorrect and

legally unsupportable. The Claimants, notably Ms. Starling, complained to Defendant about excess water as early as May or June of 2005, and the Notice explicitly mentioned discharges of "stormwater." (P. Mot., at Ex. 18, pgs. 45-46, Ex. 19, pg. 3-4). Likewise, the Notice explicitly mentions "damages recoverable under state law claims"; such damages constitute monetary, not injunctive relief. (*Id.*, at Ex. 19, pg. 4). Defendant contends that it did not notify Plaintiff of the letter because it did not believe the letter was a big deal or required the involvement of an insurance company.

Under Georgia law, however, an insured may not independently determine whether "an offense which may result in a claim" is covered or will ultimately result in a claim. *See EVI*, 188 Ga. App. at 818 (an insured was required to give notice even though it did not believe the loss was caused by a covered "occurrence"); *Royer v. Murphy*, 277 Ga. App. 150 (2006) (doubt as to coverage is not an excuse for not giving notice); *Allstate Ins. Co. v. Walker*, 254 Ga. App. 315 (2002) (same). A valid excuse for failure to provide notice "does not include the insured's conclusion that it was free of fault and that there was no liability to the other party. That is the very issue which the company must have reasonable opportunity to investigate with promptness, and which requires a prompt notice of the occurrence." *Cotton*, 652 F. Supp. at 856 (internal citations and quotations omitted).

Second, Defendant argues that Fla. Stat. § 627.426(2) should apply to this matter under Georgia's presumption of identity doctrine and that it prohibits Plaintiff from asserting

lack of notice as a reason to deny coverage. *Shorewood Packaging Co.*, 865 F. Supp. 1577, 1578-79 (N.D. Ga. 1994) (explaining the presumption of identity doctrine and Georgia choice of law rules with respect to contracts delivered outside of Georgia). Fla. Stat. § 627.426(2) states that a liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless it properly notifies the insured within a given number of days.[3] Georgia common law does not contain a notice defense like the one in the Florida statute. Georgia's presumption of identity doctrine states that Georgia courts will only apply foreign law in contravention to Georgia common law where there is a foreign statute on

---

[3]Specifically this section states:

(2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:

(a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery; and

(b) Within 60 days of compliance with paragraph (a) or receipt of a summons and complaint naming the insured as a defendant, whichever is later, but in no case later than 30 days before trial, the insurer:

1. Gives written notice to the named insured by registered or certified mail of its refusal to defend the insured;

2. Obtains from the insured a nonwaiver agreement following full disclosure of the specific facts and policy provisions upon which the coverage defense is asserted and the duties, obligations, and liabilities of the insurer during and following the pendency of the subject litigation; or

3. Retains independent counsel which is mutually agreeable to the parties. Reasonable fees for the counsel may be agreed upon between the parties or, if no agreement is reached, shall be set by the court.

point. *Shorewood*, 865 F. Supp. at 1578-79. Fla. Stat § 627.426(2) does not address how and when an insured must provide notice or when an insured's notice is considered late. If the court were to read this section broadly to cover all "notice issues" as Defendant requests, then this section could be used to overcome a vast majority of Georgia common law in the area of notice. Therefore, this court finds that section 627.436 is not a statute on point and that Georgia common law applies in this case to the issue of notice.

Third, Defendant argues that Plaintiff must show that it was prejudiced by the late notice in order to assert it as a defense to coverage. No Florida statute addresses whether Plaintiff must show prejudice. Therefore, Georgia common law applies, and it is well established under Georgia common law that prejudice is irrelevant to an insurer's assertion of notice as a coverage defense because failure to give timely notice is a failure of a condition precedent to coverage which alone voids coverage. *Canadyne-Ga. Corp. v. Continental Ins. Co.*, 999 F.2d 1547 (11th Cir. 1993); *Cotton States*, 652 F. Supp. at 856. As Defendant has asserted no viable defense for its failure to notify Plaintiff of the Claimants' concerns with Defendant's development more than one year after it became aware of them and four months after it received a detailed intent to sue letter, this court finds that Plaintiff need not provide Defendant with coverage.

**B.    Coverage of the Claims Asserted in the Underlying Suit**

13

Plaintiff argues that it has no duty under the Policy to defend, indemnify, or reimburse Defendant or otherwise pay for any damages, losses, claims, costs or expenses arising out of the underlying suit because the claims asserted in that suit against Defendants are not covered under the Policy. To determine whether the claims against Defendants are covered, the court must determine whether (1) the claims arose out of an "occurrence," and (2) whether they are excluded because they arose from the discharge of a "pollutant."

The Policy provides coverage for "property damage" caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*, at Ex. 2, pgs. 3, 12). Plaintiff contends that the property damage at issue was not caused by an "occurrence" because it was caused by Defendant's intentional, rather than accidental, land-moving activities and development. Plaintiff avers that it is irrelevant whether Defendant intended the injury, the excess run-off of silt, sediment, and storm water, because Defendant intended the means which resulted in the injury, the development. Defendant agrees that it intended the land-moving activities necessary to develop the piece of land at issue, but Defendant contends that it did not intend to cause an increase in the volume and velocity of the water leaving the development site. Defendant insists that it put numerous precautions in place to manage excess water and that but for an unexpected and unforeseen increase in rainfall, its precautions would have been sufficient. Defendant maintains that because the damage to the Claimants was not the

14

intended, designed or foreseen result of its land-moving activities, the damage was caused by an accident or an "occurrence" under the policy.

The Policy specifically excludes property damages "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of 'pollutants,'" defined as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (P's Mot., at Ex. 3, pg. 16). The damage at issue here occurred when an increased volume of water at an increased velocity carrying silt and sediment from the development flowed across the Claimants' property, into the waterways on their property, and ultimately into the Chattahoochee River. The parties appear to agree that silt and sediment are pollutants under the Policy; the parties disagree as to whether the excess water flowing off the property is a pollutant under the Policy. (D Resp., at 20). Defendants contend that the damage to the Claimants' property would not have occurred but for the water.

Three courts in this district have addressed the meaning of "occurrence" and "pollutants" in virtually identical circumstances. *See Owners Insurance Co. v. Chadd's Lake Homeowners Assoc., Inc.* ("*Chadd's Lake II*"), No. 1:05-CV-0475 (N.D. Ga. May 30, 2006) (Forrester, J.); *Owners Insurance Co. v. Chadd's Lake Homeowners Assoc., Inc.* ("*Chadd's Lake I*"), No. 1:03-CV-2050-WSD (N.D. Ga. Dec. 28, 2004) (Duffey, J.); *Owners Insurance Co. v. Lullwater Apartments, LLC*, No. 01-00128-CV-JTC-3 (N.D. Ga.

July 18, 2002) (Camp, J.), *aff'd*, No. 02-14556 (11th Cir. Dec. 30, 2002) (unpublished opinion).

*Lullwater* arose when the Lake Hills Home Owners Association brought suit against Lullwater Apartments, L.L.C., seeking damages arising from the discharge of sediment, sand, dirt, and debris via storm run-off into Dwight Carroll Lake. No. 01-00128-CV-JTC-3, at 3. Owners Insurance agreed to defend Lullwater in the lawsuit and provide insurance coverage for any potential liability under a reservation of rights; Owners then brought a declaratory judgment action to determine whether it had a legal duty to defend or indemnify Lullwater. *Id.* In deciding Owners Insurance's motion for summary judgment, the district court focused on the pollution exclusion in Lullwater's policy. This pollution exclusion was identical to the exclusion in the Policy before the court today. *Id.* at 7. The *Lullwater* court cited to numerous other cases and found that this definition of a pollutant was clear and unambiguous. *Id.* at 8. The court then analyzed whether a reasonable person in the position of the defendant would understand the pollution exclusion to encompass silt, sediment and storm water run-off as solid and liquid contaminants. *Id.* The court found that based on the existence and requirements of the Georgia Erosion and Sedimentation Act, O.C.G.A. §§ 12-7-2, 12-7-7; the Georgia Water Quality Control Act, O.C.G.A. §§ 12-5-20, 12-5-22; and the Federal Clean Water Act, 33 U.S.C. §§ 1342, 1344, "a reasonable person in the position of the [d]efendant should have recognized that silt, sediment, sand and storm water run-off are

16

solid and liquid contaminants that fall within the policy's pollution exclusion." *Id.* at 11. The court granted summary judgment in favor of Owners Insurance and found that because the pollution exclusion applied, it did not need to examine the parties' other arguments. *Id.*

Lullwater appealed the district court's summary judgment order to the Eleventh Circuit, and the Eleventh Circuit affirmed. *Owners Insurance Co. v. Lullwater Apartments*, L.L.C., No. 02-14556 (11th Cir. Dec. 30, 2002). Lullwater argued that (1) the definition of a pollutant was unambiguous and did not include silt, sediment, or storm water run-off because these items were not included in the list of items specifically mentioned as pollutants, and (2) even if the term pollutant was ambiguous in the policy, any ambiguity should be construed in favor of Lullwater, the insured. *Id.* at 3. The Eleventh Circuit disagreed; the court found that the phrase "any solid, liquid, gaseous or thermal irritant or contaminant" without any limiting language should be construed to mean *all* such irritants and contaminants. *Id.* at 4. The court determined that the phrase "including smoke, vapor, soot," etc., should not be understood as limiting language and that "to include" means "to contain as a part or member, or among the parts and members, of a whole." *Id.* at 5. Thus, the irritants and contaminants following the word including are simply illustrative examples of some of the type of substances covered and could not be considered an exhaustive list. *Id.* The court consulted the second edition of Random House's Unabridged Dictionary and defined an "irritant" as "anything that annoys" and a "contaminant" as something that

17

"makes impure or unsuitable by contact or mixture with something unclean, bad, etc." *Id.* at 6. The court held that because the silt, sediment, and storm water run-off had "significant detrimental effects on the quality of waters . . . in which they flow, and may present imminent and substantial endangerment to health or environment," silt, sediment, and storm water run-off fit within the ordinary meaning of "irritant" and "contaminant." *Id.* Having found that the relevant definition of pollutants includes *all* irritants and contaminants, the court held that silt, sediment, and storm water run-off are pollutants. *Id.* Adding that such a construction is certainly not absurd, the court noted that the Georgia General Assembly and the United States Congress have considered these things to be pollutants in other contexts and cited to cases involving the Clean Water Act and Ga. Code §§ 12-7-2 and 12-5-22s. *See, e.g.*, *Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999) (sand, silt, and rainwater run-off are pollutants under the Clean Water Act); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1525 n.1. (11th Cir. 1996) ("Under the [Clean Water Act], term 'pollutant' is inclusive of 'rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water. When rain water flows from a site where land disturbing activities have been conducted . . . it falls within this description.").

 *Chadd's Lake I* and *II*, arose after *Lullwater*, when a number of local property owners determined that 1200 cubic feet of silt and sediment had been discharged from a neighborhood construction site via water run-off and had been deposited in Chadd's Lake.

*Chadd's Lake I*, No. 1:03-CV-2050-WSD, at 3. The neighborhood association responsible for the lake filed suit against the construction company, the individuals who owned the site, and a number of other defendants. *Id.* The defendants had two insurance policies with Owners Insurance Company and demanded that Owners indemnify them with respect to the neighborhood association's claims. *Id.* at 5. Owners subsequently filed two suits, one for each policy involved, requesting a declaration of the parties' rights and obligations under the policies. *Id.* The underlying Owners policies, like the Policy here, only applied to damage that resulted from an "occurrence" and excluded damage resulting from the discharge of "pollutants." *Id.* at 19. The Owners policies defined these words just as they are defined in the instant Policy.

*Chadd's Lake I*, decided by Judge Duffey, was issued first and ruled on the meaning of "occurrence" and "pollutants" within the policy. The decision in *Chadd's Lake II*, authored by the undersigned, was issued later and adopted the holding of *Chadd's Lake I* regarding the definition of these terms. In order to determine whether the silt, sediment, and storm water run-off was an "occurrence" within the meaning of the Owners policy, Judge Duffey looked to understand the meaning of the word "accident." He found that "[a]n accident refers to an unexpected happening rather than one occurring through intention or design." *Id.* at 20 (citing *Allstate Ins. Co. v. Grayes*, 216 Ga. App. 419 (1995)). He explained that Georgia law recognizes a distinction between accidental means and accidental

19

injury. *Id.* "Where an injury is unexpected but arises from a voluntary action it is an accidental injury, but for an injury to result from accidental means, it must be the unexpected result of an unforeseen or unexpected act which is involuntarily and unintentionally done." *Id.* (citing *Winters v. Reliance Standard Life Ins. Co.*, 209 Ga. App. 369 (1993)). He then examined *Owners Insurance Co. v. James*, 295 F. Supp. 2d 1354 (N.D. Ga. 2003) (Pannell, J.), in which another court from this district had applied the accidental injury-accidental means distinction to the relevant definition of "occurrence." *Id.* at 21. The *James* court found that the particular definition of occurrence at issue in *Chadd's Lake I* and *II* and the instant case should be construed to cover only injuries resulting from accidental acts and not injuries accidentally caused by intentional acts. *Id.* at 22. The court in *Chadd's Lake I* adopted the holding in *James.* *Id.* Judge Duffey then found that it was undisputed that the silt, sediment, and water run-off alleged by the neighborhood association, although unintended, was caused by the construction company's intentional construction and land-moving activities, and therefore the damages resulting from such run-off were not caused by an "occurrence." *Id.* at 23. The *Chadd's Lake I* court found that the fact that the construction company anticipated the damages and attempted, albeit unsuccessfully, to prevent them did not render the construction company's activity accidental but rather underscored its intentional nature. *Id.*

AO 72A
(Rev.8/82)

The *Chadd's Lake I* court, relied heavily on the Eleventh Circuit's unpublished opinion in *Lullwater*, to determine the meaning of "pollutants." *Id.* at 18. The court found that "[s]ilt, sediment and storm water run-off, when discharged into the Lake, altered the content, appearance and purity of the Lake water, affecting its cleanliness and its benefit as an amenity for the homeowners in the Chadd's Lake subdivision" and thus these materials by their nature constitute irritants and contaminants and are pollutants under the policy. *Id.* at 19. As stated previously, this court in *Chadd's Lake II* adopted Judge Duffey's construction of "pollutants" and "occurrence" in *Chadd's Lake I.*

Here, under the holdings of *James* and *Chadd's Lake I* and *II*, the Policy only covers injuries or damages resulting from accidental acts. It is undisputed that the damages alleged by the Claimants, although unintended, were caused by Defendant's intentional construction activities and the mechanisms that Defendant put in place to guard against excess run-off.[4] The court recognizes that the holdings in *James* and *Chadd's Lake I* and *II* may create a somewhat awkward environment for commercial parties seeking to offset their risk with insurance. Almost every conceivable accident for which an insured could be held liable involves some intentional action at some point in the chain of causation, yet the courts have interpreted common commercial policy language to only provide coverage from random

---

[4]The court appreciates Defendant's argument that excess rain contributed to the damages; however, the court finds that Defendant's construction activities were the primary cause of the damages.

events that involve no element of intent or conscious action.  *See, e.g.*, *Essex Insurance Company v. H&H Development Corp.*, 525 F. Supp. 2d 1344, 1350-51 (M.D. Ga. 2007) (Royal, J.) (explaining the practical problems with adopting *James* and *Chadd's Lake* and refusing to do so).  While this court is sympathetic to Judge Royal's arguments, it is loath to rule against three prior cases in this district with virtually identical facts.  Thus, this court finds that damages demanded by the Claimants and asserted as claims against the Defendant were not caused by an "occurrence," and under the Policy, Plaintiff need not defend or indemnify Defendant with respect to these damages.

    With respect to the pollutant exclusion, the only question before the court is whether water was a pollutant in this instance.  It is undisputed that excess water, resulting from the Defendant's development activity and perhaps exacerbated by unexpected rainfall, caused damage when it left Defendant's development site and ran onto the Claimants' property and ultimately into creeks and rivers.  Under *Lullwater* and *Hughey*, storm water is a pollutant and "[w]hen rain water flows from a site where land disturbing activities have been conducted . . . it falls within [the description of a pollutant]."  Therefore, Defendant's claims relating to these damages are excluded.

### III. Conclusion

Plaintiff's Motion for Summary Judgment is [51] GRANTED.

Defendant's Motion for Partial Summary Judgment [50] is DENIED.

On January 2, 2008, Defendant filed a Motion to Seal certain redacted portions of its Motion for Summary Judgment and Statement of Material Facts related to its confidential settlement with the parties to the underlying suit. This court strongly respects the presumption in favor of open courts and will not seal documents on which it relies to make a dispositive ruling without particularly good cause. This court found that it was able to rule on the motions before it, including Defendant's Motion for Partial Summary Judgment, without relying on the redacted portions of Defendant's briefs and other filings. Therefore, this court DENIES Defendant's Motion to Seal [54]. The court will allow Defendant leave to move to withdraw its Settlement Agreement and the unredacted documents relying upon it from the docket within thirty (30) calendar days of the date of this order. If Defendant has not done so within that time, the court DIRECTS the Clerk of Court to unseal these documents.

**IT IS SO ORDERED** this 19th day of September 2008.


_____ s/ J. Owen Forrester _____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE


23